**UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**KEVIN J. MILLS,**

**Plaintiff/Counterclaim Defendant,**

**v. Case No. 3:09cv294-MCR/CJK**

**INNOVATIVE ENERGY GLOBAL,
LTD., A UNITED KINGDOM COMPANY,**

**Defendant/Counterclaim Plaintiff.**
**_____________________________________/**

**O R D E R**

Pending before the court are cross motions for summary judgment (docs. 53 & 81); a motion for summary judgment on counterclaims filed by the defendant, Innovative Energy Global, Ltd., a United Kingdom company ("defendant" or "I.E. Global (UK)") (doc. 80); and numerous responses and replies between the parties. Having now reviewed the pleadings, the record on file, and the parties' arguments, the court DENIES Mills' motion for summary judgment; GRANTS defendant's motion for summary judgment on Mills' claims; and DENIES the defendant's motion for summary judgment on its counterclaims.

**Background**

This is a contract dispute regarding the validity of, or right to rescind, an employment agreement between Mills and I.E. Global.[1] The undisputed facts in this case include the following. Mills invented a chemical process which converts a biomass-derived polymer

[1] This case was removed from state court on the basis of the court's diversity jurisdiction. *See* 28 U.S.C. §§ 1332 & 1441. Mills is a Florida resident, and I.E. Global is a United Kingdom company. The court determined by a prior order denying plaintiff's motion to remand that the requisite amount in controversy is met. (*See* doc. 28.)

into a liquid fuel through a process known as fast pyroloysis; the technology associated with this conversion process is known as E-Grass technology. In 2003, Mills began working with a Florida company, Biomass Investment Group ("BIG"), developing this technology. An employment contract between Mills and BIG, signed October 11, 2004 and governed by Florida law, includes a provision assigning to BIG all of Mills' prior inventions and original works that relate to BIG's business and all works that would be created during Mills' employment with BIG, in exchange for a base salary of $120,000; and 5% ownership in the company, and a noncompete agreement. BIG had financial difficulties and Mills asserts it failed to pay him all money that was due under his employment contract.

Innovative Energy Global, Limited, a British Virgin Islands company ("I.E. Global (BVI)"), was incorporated in July 2007.[2] In late July or August 2007, I.E. Global (BVI), BIG and another company, Florida Biomass Energy Group, LLC ("FBEG"), entered into an agreement.[3] (*See* docs. 78-9; 78-10.) According to this agreement, BIG agreed to transfer all of its E-Grass technology and all associated intellectual property rights to I.E. Global (BVI), which would then attempt to develop the technology. In the agreement, BIG explicitly consented to I.E. Global (BVI) hiring "designated personnel," specifically including Kevin Mills. (Doc. 78-9, at 13.) Mills admitted in his deposition that he approved this transaction as a member of BIG's board of directors. On August 17, 2007, BIG entered into a technology transfer agreement, required as part of this overall transaction, transferring to I.E. Global (BVI) BIG's full, exclusive, and entire right and interest in the E-

---

[2] Mr. Muhammad Rafique was named as the Managing Director with shareholders listed as Muhammad Rafique, Muhammad Harris Bilal, and Mrs. Narmeen Hasan Khan. The defendant, I.E. Global (UK), was not incorporated until August 13, 2008; its incorporation documents list Muhammad Rafique as Director, and list the shareholders as Mrs. Ummara Rafique, Miss Mashal Hasan Khan; and Mr. Kevin James Mills.

[3] The agreement recites that I.E. Global (BVI) had invested in BIG in 2006 for the development of the E-grass technology, and that during the same year, I.E. Global (BVI) and BIG both had invested in FBEG for the development of a biomass power plant in Florida that would use this technology. Additional recitals in the agreement state that I.E. Global (BVI), BIG and FBEG entered into this agreement because BIG and FBEG were unable to meet their fund-raising obligations under other investment agreements. For instance, BIG had been obligated to raise funds to build a Process Development Unit ("PDU") to demonstrate that the technology could be successful on a commercial basis, but it had thus far raised insufficient funds to do so.

Grass technology.[4] On August 30, 2007, BIG's chief executive officer, Allen Sharpe, notified Mills by letter that, "I have been informed that you have been employed by Innovative and therefore I have terminated your employment with BIG as required by the Innovative Agreement." (Doc. 78-11, at 10.) Sharpe explained to Mills that this termination did not alter his stock ownership in BIG or his obligations under the employment agreement, such as confidentiality, though they waived the noncompete restriction "as to Innovative as part of the Innovative Agreement." (*Id.*) The letter also states, "there will be no severance compensation due you since you agreed to the provisions of the Innovative Agreement and since you requested that you be terminated by BIG so you could accept employment with Innovative." (*Id.*)

In August 2007, Mills began receiving payments totaling approximately $135,000 per year from One World Trade ("OWT") through Landrum Professional Employer Services. OWT is a Georgia company created in June 2007 by John Smeltzer; its president is Forrest Stacy. According to Mills, OWT, was unrelated to I.E. Global at the time because their written agreement was not executed until September 2008, and OWT was paying Mills solely for his work as a project manager for a project (a "process demonstration unit" or "PDU") being developed in Golden, Colorado. Documentary evidence, however, shows that Mills acted with knowledge that the two companies were affiliated – on September 21, 2007, Mills signed an agreement to obtain consulting services from another firm, and the agreement identified the "client" as "Innovative Energy Global Limited, One World Trade Limited," and Mills signed the document as "Vice President, Process Operations," for I.E. Global. (See doc. 78-40.) Also, documentary evidence in the record shows that the companies' affiliation predated the September 2008 written agreements, and dates back to August 2007.[5] The declaration of Muhammad

---

[4] I.E. Global (BVI) later transferred its rights to I.E. Global (UK), but Mills disputes that BIG had any intellectual property rights to convey to I.E. Global (BVI) in the first instance due to BIG's outstanding and unfulfilled financial obligations to Mills.

[5] The declaration of Ummara Rafique and attached exhibits demonstrate a connection. Ms. Raffique states that OWT was formed for the purpose of facilitating and developing biomass projects for I.E. Global (BVI) and later I.E. Global (UK), and that I.E. Global was responsible for funding the costs of the work

Rafique explains that his corporation, Innovative Energy for Investments ("IEI"), funded OWT for the benefit of I.E. Global and that the funds were paid to a staffing firm to pay the individuals working for I.E. Global.

An employment agreement, dated December 15, 2007, is the focal point of this lawsuit. On the face of the agreement, Mills and “Innovative Energy Global Ltd,” entered into an employment agreement, governed by Georgia law, whereby Mills was promised a seat on the board of directors, which was required to be established by January 2008; 5% ownership of the company, including the biomass technology; an annual salary of $250,000; and a potential bonus of $500,000. Mills had the authority to direct where payment would be made. The agreement expressly provided that all inventions and other protected works developed by Mills during his employment belonged to the company.

The agreement is signed by Mills and Shahid Khan, president of I.E. Global, with a preprinted date of December 15, 2007, below each name.[6] There is no dispute that the draft originated from Khan and John Smeltzer in December 2007; that negotiations ensued; and that revisions were made to the original. In Khan's affidavit, he states that on December 17, 2007, he sent the agreement now at issue to Smeltzer and directed him to provide it to Mills for his signature if he agreed to the terms. Mills emailed Khan a signed version on December 17, 2007, with no changes marked, and he copied Smeltzer and Stacy (who were officers of OWT) on the email. Mills included a note indicating his understanding that he had a right under the agreement to direct where his salary would be paid, and stating he would like to speak with Khan about that "before any changes are

---

performed by OWT. "Any property, including intellectual property, OWT created, purchased, leased or secured in connection with its operations is the property of I.E. Global (UK)." (Doc. 78-51, at 3.) A development agreement between the two parties dated September 2008, which was entered for the express purpose of memorializing the agreement the parties had been operating under since OWT was formed, explains that I.E. Global (BVI) has been developing the biomass technology through the construction and development of a PDU in Golden, Colorado, and that OWT was formed for that purpose. Loan and credit agreements (docs. 78-54 & 78-19) recite that since August 2007, IEI has been forwarding project funds to OWT on a line of credit for the benefit of I.E. Global (BVI)'s projects.

[6] The agreement does not list an address for the company. Although Mills presented evidence indicating that the parties were discussing forming a company in the United Kingdom and/or a company in the United States, these are not referenced in the agreement.

made to my paycheck."[7] (Doc. 78-25, 3.) Khan responded by email on December 26, 2007, acknowledging Mills' email and stating, "We are looking forward to a long and prosperous relation with you." (*Id.*, at 2.) Mills never received the contracted annual salary of $250,000, but OWT continued to consistently pay him approximately $135,000 annually (until his salary was lowered in December 2008).[8]

Mills asserts that the original employment agreement was never valid because he revoked his acceptance on June 4, 2008, before he received a counter-signed copy from Khan, which arrived on June 8, 2008. In his June 4, 2008, email, Mills expressed disappointment that the investments in the company by Mr. Rafique had not been as great as initially promised, and he states that the terms of his "decisions last August" would have been different had he known this at that time. Mills continued:

> Since I hastily put my employment agreement together to meet your end of December, 2007, deadline under false assumptions (the investment amount and the organizational structure) and since I still do not have your signature on that agreement, I would like to amend . . . my agreement to include all our biomass organizations . . . . Neither you [n]or Mr. Rafique should be concerned with this since I have been working to the best of my ability for the past 10 months without an agreement. Please sign and execute the attached revised agreement.

(Doc. 55-11, at 1.) In the attached revision, Mills suggested stating the company's location and stating, "Company shall also include companies formed to exploit the Intellectual Property, Inventions and Trade Secrets described in this agreement." (Doc. 106-5.) Khan responded the same day, stating he had signed the original employment agreement; he did not realize that Mills had not received a copy; and he stated Mills should have reminded him of this when they were recently together in Dubai and taken a copy with him. He specifically stated:

---

[7] He also requested that funds for the PDU be released so vendors could be paid. The record indicates that Rafique had stopped funding the project until everyone had written employment agreements in place. Khan responded, "On Jan 2nd we will transfer additional funds to USA for PDU." (Doc. 78-25, at 2.)

[8] Mills said he thought the new salary would "supplant" this $135,000 amount.

> I had signed the employment agreement which was sent earlier and never realized that you have not been sent a copy. Owais from our office was handling filing of all such agreements. It is only when Bud mentioned in Atlanta that you do not have [a] signed copy I requested him to send me another copy so that in case I can not locate Owais file I can sign another copy. You should have reminded me about it and taken a copy with you.

(Doc. 55-12.) Khan assured Mills he was a "core member of our team," and he requested that Mills highlight his "changes from original agreement because that draft was cleared by lawyer and approved by Mr. Rafique for signatures." (*Id.*) Mills responded, telling Khan that the changes were marked in red and only in the first paragraph. Khan forwarded a copy of the original signed agreement to Mills on June 8, 2008, and responded to Mills' suggested changes stating, "The address of the Company can be added once we have its location sorted out. We will just change the first page of the agreement." (doc. 55-13.) Mills thanked him on June 9, 2008, and reasserted that he wanted to include the revised paragraph that he sent last week, or some similar paragraph to maintain his ownership in the business; Khan responded that they would take up the matter when they saw each other next. (Doc. 55-14.) In another email, Mills agreed to discuss details of his employment agreement with Khan later in June 2008, but stated that he was concerned about the location of the company, stating, "this continues to be an unenforceable contract for me – I have no means of recourse with Global located in 'who knows where?'" (Doc. 106-4.)

On August 13, 2008, I.E. Global (UK) was incorporated.[9] A technology assignment dated September 15, 2008, was executed to transfer and assign the E-Grass technology, intellectual property, and employee contracts from I.E. Global (BVI) to I.E. Global (UK). It is undisputed that Mills was aware his employment agreement was assigned from I.E. Global (BVI) to I.E. Global (UK), and that he made no objection to the assignment. (Doc. 108, at 19 ¶ 53.) An email from the company's attorney to Mills in October 2008 requests Mills' signature on the assignment as a director of I.E. Global (UK). Nonetheless,

---

[9] Mills asserts he did not know of this until November 2008 and that he never received any certificate indicating he has 5% ownership, though he is listed on the articles of incorporation has having the shares.

employment contract issues continued to be discussed. Mills sent an email to Alan Jenkins, attorney for the company, on August 25, 2008, stating Khan had given permission for Mills to ask Jenkins "to complete my employment agreement since I don't have the time." (Doc. 106-7.) Mills wrote Stacy on August 31, 2008, stating he would like to include retroactive pay on his employment contract which was supposed to be executed prior to December 15, 2008. The company indicated it would calculate and pay the difference between what Mills was receiving and what he should have received since December 15, 2007, and would correct his salary payment to the $250,000 amount. However, Mills informed the company that he would "not receive any of the funds until we get the compensation package completed which includes setting a means to receive these funds (or send them to a non US entity) outside the US to protect these funds." (Doc. 106-9.) Khan then responded that "we will be most pleased to assist you in every possible manner. Let me know what you would like me to do." (*Id.*)

During his employment, Mills made a formal assignment of a patent application in favor of I.E. Global, as required by his employment agreement. Mills asserts, however, that he never surrendered possession of the intellectual property or associated documentation and instead continues to maintain those materials as his own trade secrets, subject to a pending patent application which is pending.

Mills' salary was cut in December 2008. Mills formally resigned as director of I.E. Global (UK) on May 14, 2009. In his resignation letter, he states that his employment agreement should have been executed in August 2007, but it was not; he was then forced to hastily execute an employment agreement in December 2007 "to avoid a discontinuity in the One World Trade Limited (OWT USA) finances to avoid subsequent late payments to our creditors and contractors." (Doc. 78-30.) He states he executed his agreement to "Innovative Energy Global Limited, a company that was not in existence at the time." (*Id.*) He stated that his salary was never modified pursuant to the employment agreement, so I.E. Global "has been in breach since December 15, 2007." (*Id.*) He then detailed the fact that he did not receive a countersigned copy until June 2008, so he believed the contract was not valid. He also stated he would retain intellectual property surrounding patents filed

to date until such time as the patents are awarded, at which time, he acknowledged, they will become property of I.E. Global. Mills cited other reasons for his resignation as well, including the organization and financing of the company and management changes.

Mills filed a two-count complaint (1) seeking a declaration that the employment contract is invalid; and (2) alleging rescission on grounds of I.E. Global's nonperformance. I.E. Global denied the allegations and filed counterclaims for breach of contract and conversion, alleging Mills failed to disclose protected works and inventions that he made or conceived during his employment, and that he failed to return, and wrongfully maintains possession of, property and intellectual property belonging to I.E. Global.

**Discussion**

Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court may not weigh conflicting evidence to resolve a dispute of fact at this stage of the proceedings. *See Carlin Communication, Inc. v. So. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986). Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir.1995). When cross motions for summary judgment are pending, the court must rule on each individual motion on its own merits, viewing the evidence in favor of the nonmoving party in each instance. *Avocent Huntsville Corp. v. ClearCube Tech., Inc.*, 443 F. Supp.2d 1284, 1293-94 (N.D. Ala. 2006); *see also Shaw v. Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538-39 (5th Cir. 2004) ("Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."), *cert. denied*, 546 U.S. 816 (2005). Even if facts are

undisputed, summary judgment is inappropriate where "divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 933 (9th Cir. 2006). "Furthermore, a court may discover questions of material fact even though both parties, in support of cross-motions for summary judgment, have asserted that no such questions exist." *Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 824 (11th Cir.) (per curiam, affirming on the basis of, and appending, the district court's order), *cert. denied*, 467 U.S. 1242 (1984).

Mills' Motion for Summary Judgment

Mills moves for summary judgment, arguing that there was no valid contract because the employment agreement was ambiguous regarding the intended corporate counter party; that I.E. Global did not communicate assent to a contract; and that, if valid, the contract was not performed and may be rescinded.

Under Georgia law, as elsewhere, the mutual consent of the parties is essential to the formation of a contract.[10] *See* Ga. Code Ann. § 13-3-2 (stating, "the consent of the parties being essential to a contract, until each has assented to all the terms, there is no binding contract; until assented to, each party may withdraw his bid or proposition"). Georgia law provides that "a definite offer and complete acceptance, for consideration, creates a binding contract." *Fernandez v. Websingularity, Inc.*, 681 S.E.2d 717, 721 (Ga. Ct. App. 2009); *see also Citizens Trust Bank v. White*, 618 S.E.2d 9, 11 (Ga. Ct. App. 2005). In other words, where parties "intended to enter into an agreement" and "expressed their mutual intentions to be bound," they have formed a contract. *Jackson Elec. Membership Corp. v. Ga. Power Co.*, 364 S.E.2d 556, 557-58 (Ga. 1988). Also, "[a]cceptance of an offer must be unconditional, unequivocal, and without variance of any sort, otherwise, there can be no meeting of the minds and mutual assent necessary to formation of a contract." *Valiant Steel & Equip., Inc. v. Roadway Express, Inc.*, 421 S.E.2d

---

[10] The agreement at issue provides, "This Agreement shall be deemed to be made in and shall in all respects be interpreted, construed and governed by and in accordance with the laws of the State of Georgia (without giving effect to the conflict of law principles thereof)." (Doc. 1-2, at 16.) Therefore, in this diversity action, the court applies Georgia law.

773, 775 (Ga. Ct. App. 1992) (internal marks omitted). "In determining whether there was a mutual assent, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent." *Terry Hunt Const. Co. v. AON Risk Servs., Inc.*, 613 S.E.2d 165, 169 (Ga. Ct. App. 2005). There may be cases in which "circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement." *Id.* If this type of extrinsic evidence regarding mutual assent is disputed, the question of whether a contract existed is a question of fact for a jury. *See id.*

Mills asserts that the contract is invalid due to lack of mutual assent and that no questions of fact exist. Mills does not argue that he did not assent to the contract on December 17, 2007 (the day he signed it and returned it to Khan).[11] Instead, he argues that Khan failed to assent, and that he, Mills, revoked the contract by making a counter offer prior to receiving Khan's assent. Mills relies on the fact that Khan did not return a signed copy until June 8, 2008, and that Khan did not agree to the modified terms that Mills sent on June 4, 2008.[12] The undisputed facts on the record, however, do not support Mills' characterization of the events.

The record reflects that the contract draft originally came from Khan and underwent some negotiations and revisions between the parties in early to mid December. On December 17, 2007, Khan sent a copy to Smeltzer, directing him to provide it to Mills for his signature if he agreed to the terms. Mills signed it without making any further changes.

---

[11] Mills' admits in his answer to the amended counterclaims that he entered into the agreement with I.E. Globall (BVI) in December 2007. (Doc. 105, ¶ 9.)

[12] I.E. Global asserts that this issue is not properly before the court because Mills' pleading did not assert lack of mutual assent. The court disagrees. Count I seeks a declaration that the agreement is invalid or void. Notice pleading does not limit the plaintiff to the factual averments of the complaint when proving a legal claim. The statement of the claim in the complaint "need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal alterations omitted) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Lack of mutual assent is merely another theory by which the claim can be proved.

When Mills emailed it to Khan that day, he stated a desire to speak with Khan about where payment should be directed, referencing his right to do so under the agreement. Mills' acceptance was complete when he signed and returned the agreement with no further changes.

Mills argues that it was necessary for Khan to indicate his assent by sending Mills a signed copy of the agreement, citing *Fernandez*. *Fernandez v. WebSingularity, Inc.*, 681 S.E.2d 717, 721-22 (Ga. Ct. App. 2009). In that case, however, the contract had explicitly provided that the company had 30 days from receipt of the signed agreement to either accept or reject it. The agreement at issue here contained no such provision. The fact that Mills did not receive a countersigned copy until June 8, 2008, is irrelevant to the formation of the agreement. "[A]ssent to the terms of a contract may be given other than by signatures." *Terry Hunt Constr.*, 613 S.E.2d at 169. Khan indicated his assent after Mills sent the agreement – on December 26, 2007, Khan emailed his acceptance, acknowledging Mills' email and stating, "We are looking forward to a long and prosperous relation with you." (Doc. 78-25, at 2.) *See Reny v. Sneed*, 647 S.E.2d 379, 380 (Ga. Ct. App. 2007) (stating an acceptance of an offer, even after a time limit, "is binding on the offeror if he assents to the acceptance after it is made"). The record establishes that Khan made the offer, Mills accepted on December 17, 2007, and Khan confirmed his receipt and assent on December 26, 2007. Thus, the contract was supported by mutual assent at that time. Mills' June 4, 2008 email proposing a slight modification to the first paragraph of the original agreement, therefore, amounted to a proposal to modify the original agreement. Because a binding contract had already been entered in December 2007 by Khan's offer and Mills' acceptance, the June 4 email was not effective to revoke it.

Mills argues that an ambiguity in the employment agreement regarding the identity of the contracting corporate entity renders the agreement void.[13] "The construction of a contract, including the existence or nonexistence of any ambiguities in the contract,

---

[13] Essential elements of an employment contract include "[t]he nature and character of the services to be performed, the place of performance, and the amount of compensation to be paid," and they "must be stated with sufficient definiteness." *City of McDonough v. Campbell*, 696 S.E.2d 150, 152 (Ga. Ct. App. 2010) (internal marks and alteration omitted). There is no suggestion that these elements were not met.

presents a question of law for the court." *McKinley v. Coliseum Health Group, LLC*, 2011 WL 1087094, at 2 (Ga. Ct. App. Mar. 25, 2011). The construction of a contract under Georgia law involves three steps:

> At least initially, construction is a matter of law for the court. First, the trial court must decide whether the contract language is clear and unambiguous. If it is, the trial court simply enforces the contract according to its clear terms; the contract alone is looked to for meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

*Id.* (quoting *Record Town, Inc. v. Sugarloaf Mills Ltd. Partnership of Ga.*, 687 S.E.2d 640, 642 (Ga. Ct. App. 2009)); *see also Magnetic Resonance Plus, Inc. v. Imaging Sys. Int'l*, 543 S.E.2d 32, 34 (Ga. 2001). Thus, "a jury question is presented only when the application of the rules of construction fails to resolve the ambiguity." *Andrews v. Skinner*, 279 S.E.2d 523, 525 (Ga. App. 1981). The "cardinal rule of construction" is to determine the intent of the parties, and where the terms of a contract are plain and unambiguous, the court looks to the contract alone to find the parties' intent. *Magnetic Resonance Plus*, 543 S.E.2d at 34. The court therefore looks to the plain meaning of the words in the contract and, if possible, construes it "so as not to render any of its provisions meaningless and in a manner that gives effect to all of the contractual terms," with the words bearing their usual and common meanings. *NW Parkway LLC v. Lemser*, 2011 WL 1049180, at *3 (Ga. Ct. App. Mar. 24, 2011). A contract is deemed ambiguous only if its terms are subject to more than one reasonable interpretation. *Infinity Gen. Ins. Co. v. Litton*, 2011 WL 906638, at *2 (Ga. Ct. App. Mar. 17, 2011). If there is an ambiguity, "parol evidence is admissible to explain an ambiguity in a written contract, although such evidence is inadmissible to add to, take from, or vary the writing itself." *McKinley*, 2011 WL 1087094, at *2 (internal marks omitted). Further, "'[t]he construction placed upon a contract by the parties thereto, as shown by their acts and conduct, is entitled to much weight and may be conclusive upon them.'" *Id.* (quoting *Scruggs v. Purvis*, 126 S.E.2d 208 (Ga. 1962)).

Mills suggests there is an ambiguity in the agreement's failure to reference the corporation's country of origin because there now are two corporations bearing the name "Innovative Energy Global Ltd." – one incorporated in the British Virgin Isles and the other in the United Kingdom. However, the primary goal of contract construction is "to ascertain the intent of the parties *at the time they entered the agreement*." *Thomas v. B & I Lending, LLC*, 581 S.E.2d 631, 634 (Ga. Ct. App. 2003) (emphasis added). The employment agreement, dated December 15, 2007, plainly identified the company as "Innovative Energy Global Ltd," and the agreement was signed both by Mills and by Khan, as president of I.E. Global. There is no dispute that at the time the contract was signed, the only "Innovative Energy Global Ltd." in existence was I.E. Global (BVI), of which Khan was president, eliminating any need to identify the company's country of origin. To the extent there is some latent ambiguity due to subsequent events, as Mills suggests, the court may consider parol evidence to explain it. *Nguyen v. Talisman Roswwell, LLC*, 585 S.E.2d 911, 912 (Ga. Ct. App. 2003) (citing Ga. Code Ann. § 24-6-3); *Summerville v. Belk-Rhodes Co.*, 286 S.E.2d 497, 499 (Ga. Ct. App. 1981). I.E. Global (UK) was not formed until August 2008. Additionally, Mills' deposition testimony indicates he understood he was contracting with I.E. Global (BVI), and no contrary intent is evident on the face of the instrument.[14] The court finds no ambiguity regarding the identity of the contracting corporate entity.

Mills argues that the language of the agreement indicates the formation of another entity was contemplated, causing an ambiguity, because the contract provides in part that a board of directors, on which Mills was promised a seat, must be established prior to January 31, 2008. Even assuming this provision was intended to relate to some yet unformed entity (which is not apparent on the face of the agreement), this establishes a performance obligation; it does not impact the validity of the contract formation nor does it inject an ambiguity rendering the contract invalid. Performance obligations do not impact

[14] Mills asserts that he was contracting with a company to be named later because it was unclear which of the two Innovative Energy Global entities he was contracting with in June of 2008, when he proposed his modification. This argument depends on his premise that he effectively revoked the December 2007 contract in his June 4, 2008 email, a premise that the court rejects for reasons stated above. This argument therefore lacks merit.

the validity of the agreement because where a contract includes a condition, it is assumed that each party "has impliedly promised to use his best efforts to bring about the happening of the condition to his promise." *Jackson Elec. Membership Corp. v. Ga. Power Co.*, 364 S.E.2d 556, 557-58 (Ga. 1988). Moreover, in Mills' answer to I.E. Global's counterclaims, he admits that he entered into an employment agreement with I.E. Global (BVI) in December 2007; that I.E. Global (BVI) was in existence at that time; and that Khan signed the agreement on behalf of I.E. Global (BVI) in December 2007. (Doc. 105, ¶¶ 9, 10, 11.) There is a general rule that "a party is bound by the admissions in his pleadings," *Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983); and where a party admits a particular fact in his answer, he is estopped to deny it later. *United Sttes ex rel. Stanley v. Wimbish*, 154 F.2d 773, 774 (4th Cir. 1946); *Columbus Bank & Trust Co. v. McKenzie Trucking & Leasing, LLC*, 2009 WL 3526648, at *3 (M.D. Ga. 2009) (unpublished). "[J]udicial admissions are proof possessing the highest possible probative value. Indeed, facts judicially admitted are facts established no only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them." *Best Canvas Prods.*, 713 F.2d at 621 (internal marks omitted). With these admitted facts, Mills cannot now claim that a dispute of fact exists regarding the entity with which he contracted.

Mills also asserts that the contract is invalid because it was assigned from I.E. Global (BVI) to I.E. Global (UK), and, according to Mills, Georgia law does not permit the assignment of a contract for personal services, citing *Forrest & George Adair v. Smith*, 98 S.E. 224, 227 (Ga. Ct. App. 1919). In that case, the court noted: "Certain classes of contracts are inherently nonassignable in their character, such as promises to marry, or engagements for personal services, requiring skill, science, or peculiar qualifications." *Id.* This proposition, however, does not govern the facts at issue. This nonassignability principle may prohibit someone in Mills' position from assigning his obligation to perform personal services under the contract to another without consent, but Mills did not attempt to assign the contract to someone else to perform the services in his stead. In this situation, the parties were aware and assented to the assignment. Mills admitted that he

was aware of the assignment and did not object. Mills' consent was demonstrated through his acceptance of a seat on the board of directors of I.E. Global (UK) and his continued work for the company until his resignation in May 2009. The court in *Forrest & George Addair* concluded that, as always, the intent of the parties as shown by the contract governs, and "there is no reason why the law would forbid or prevent his making a contrary agreement authorizing the [assignment of] the contract of service to another." *Id.* (involving a contract for the payment of rent). The court further stated, "it should be considered that he intended to do that which he actually did." *Id*.

Mills argues alternatively that I.E. Global's failure to perform the terms of the contract, failing to pay his salary of $250,000 and failure to provide him with stock certificates, entitles him to rescind the agreement. Under Georgia law, rescission is permitted based upon a breach or nonperformance of a contract if the breach is so substantial that it defeats the purpose of the contract. *See Mayor & City of Douglasville v. Hildebrand*, 333 S.E.2d 674, 676 (Ga. Ct. App. 1985); *see also* Ga. Code Ann. §13-4-62 ("A party may rescind a contract without the consent of the opposite party on the ground of nonperformance by that party but only when both parties can be restored to the condition in which they were before the contract was made."). However, "[r]escission, as a forfeiture of rights under an otherwise valid contract, is not favored under the law, and courts are quick to find that the right to rescind has been waived. Waiver generally is found where the intent to rescind is not asserted in a timely fashion." *Lehman v. Keller*, 677 S.E.2d 415, 418 (Ga. Ct. App. 2009) (internal marks omitted). Additionally, it is important that the party intending to rescind "announce his intent to do so as soon as the facts underlying the claim are known." *Id.* There is also a rule that "[e]quity will not grant relief where there is an adequate and complete remedy at law." *Prosser v. Hancock Bus Sales, Inc.*, 349 S.E.2d 460, 460-61 (Ga. 1986);*see also* Ga. Code Ann. § 23-1-4.

According to Mills, he was not paid the correct salary and what he received was paid by OWT to Landrum, not by I.E. Global (BVI). Mills directs the court to evidence that the agreement between OWT and I.E. Global (BVI) was not in place until September 2008; thus, he argues OWT was under no obligation to pay on behalf of I.E. Global (BVI). Mills

also asserts that he did not receive shares in the company as promised. There is no dispute that I.E. Global did not pay Mills the $250,000 annual salary promised in the agreement, although defendant has presented facts indicating it attempted to pay him the correct salary after discovering the discrepancy, and Mills would not accept it at that time.[15] The record also demonstrates that OWT paid the salary on behalf of I.E. Global (BVI), and later for I.E. Global (UK), contrary to Mills' assertion. Mills presented no evidence to the contrary, he accepted the salary given, and he held himself out as an I.E. Global employee and director and made no representation otherwise until his formal resignation letter in May 2009. Mills asserts that he did not receive shares in the company as promised and that ownership of the technology through these entities was a high priority to him, but defendant presented evidence that the corporate documents of I.E. Global (UK) list Mills as owning shares in the company, consistent with the agreement. The court finds that Mills is not entitled to summary judgment on this claim. As a matter of law, there is no evidence from which a trier of fact could find that he promptly rescinded and offered to return the benefits he received under the contract, as required for rescission and discussed further below.[16]

I.E. Global (UK)'s Motions for Summary Judgment

Defendant moves for summary judgment on Mills' claims and also on its claims for breach of contract and conversion. As discussed above, the undisputed facts indicate that the December 2007 employment agreement was valid and not void. For the same reasons articulated above and incorporated by reference into this discussion, including the statements of Georgia law, the court concludes that defendant is entitled to summary judgment on Count I of Mills' complaint.

---

[15] A company email in September 2008 noted that Mills was not receiving his $250,000 salary and that the difference should be calculated and paid at the first opportunity, to which Mills responded "I will not receive any of the funds until we get the compensation package completed which includes setting a means to receive these funds (or send them to a non US entity) outside the US to protect these funds." (Doc. 78-31.)

[16] Mills also attempted to demonstrate confusion at the time of contracting regarding the identity of the corporate entity, but this was a fact that was within his knowledge and ability to correct at the time, so it will not support rescission. *See Georgia Pac. Corp. v. Lieberam*, 959 F.2d 901, 907 (11th Cir. 1993) (citing Georgia law for the proposition that "[a]bsent special circumstances, the court cannot correct for the mistake or ignorance of one party when he had the responsibility, and opportunity, to protect himself." (internal marks omitted)).

Defendant also asserts it is entitled to summary judgment on Mills' claim of rescission, arguing that there are no material facts in dispute. According to defendant, even if Mills had a valid basis for rescission due to the alleged nonperformance of the defendant, the undisputed facts demonstrate that Mills knew of his contracted salary in December 2007 but accepted a lower payment for 17 months; therefore, defendant asserts rescission was not prompt. Defendant also asserts that Mills has retained the benefits of the contract, which defeats rescission. The court agrees. There is no dispute that Mills has retained the salary paid to him. *See Int'l Sofware Solutions, Inc. v. Atlanta Pressure Treated Lumber*, 390 S.E.2d 659, 661 ("Generally in this state, a party desiring to rescind a contract must, as a condition precedent to such rescission, restore or tender the benefits received under the contract.") (Ga. Ct. App. 1990);[17] *see also* Ga. Code Ann. §13-4-62 (permitting rescission for nonperformance of a contract only when "both parties can be restored to the condition in which they were before the contract was made."). Mills argues that he had an additional basis to rescind due to the breach of the dependent covenant and that disputes of fact exist regarding whether he received the stock, which was a substantial purpose of the agreement. Although he would have known early on whether he had received stock in I.E. Global (BVI), viewing the facts in the light most favorable to Mills, if the parties agreed to satisfy this contractual requirement with stock from a company yet to be formed, Mills would not have known of a failure to provide him with the stock pursuant to the agreement until much later than December 2007. I.E. Global (UK) was not incorporated until August 2008; Mills asserts that he was not aware of this until approximately November 2008. Even assuming these statements as true, Mills continued to accept payment and act on behalf of I.E. Global (UK) for six more months; he did not formally resign until May 2009. Equity would not consider this to be prompt rescission.

---

[17] The court in *Int'l Software Solutions* indicated that this is a rule of justice and equity, so if the defendant makes it impossible to return the consideration, or if it would be unreasonable to do so, rescission may be maintained without a tender of the benefits. 390 S.E.2d at 661. "Restoration does not require that the opposite party be placed in exact status quo, but only that he be placed substantially in his original position, and that the rescinding party shall derive no unconscionable advantage from the rescission." *Id.* However, the court also indicated that the rescinding party must have offered to pay the money back. *Id.* In this case, there is no evidence that Mills made such an offer or indicated such an intent.

*See Lanier Home Ctr., Inc. v. Underwood*, 557 S.E.2d 76, 79 (Ga. Ct. App. 2001) (explaining that a rescinding party must "at once announce" the decision to rescind upon discovering the facts that authorize rescission); *see also Walker v. Johnson*, 630 S.E.2d 70, 75 (Ga. Ct. App. 2006) (holding six month delay to be unreasonable as a matter of law, resulting in waiver of the right to rescind).

Therefore, while there may remain some questions of fact on issues related to the rescission claim, those issues are not material to the court's conclusion that Mills is not entitled to the equitable relief of rescission on Count II due to nonperformance because of his failure to promptly rescind and return the benefits of the contract.[18] Furthermore, Mills has an adequate remedy at law for damages. *See Prosser*, 349 S.E.2d at 460-61.

Defendant also moves for summary judgment on its counterclaims of breach of contract and conversion. A breach of contract claim requires proof of "(1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Duke Galish, LLC v. Manton*, 2011 WL 826940, at *4 (Ga. Ct. App. 2011). Defendant asserts that Mills breached the employment agreement by failing to disclose protected works or inventions and by his failure to return property and intellectual property belonging to defendant through the assignments and Mills' employment contract. Mills admitted retaining some intellectual property but asserts that defendant has no superior right to possession due to its first breach of contract with regard to salary and provision of stock certificates, and he asserts that his 5% ownership in the technology entitles him to lawful possession and an equitable lien of possession against it for his full payment. *See*

---

[18] I.E. Global asserts that Florida law governs the rescission issue because where a party seeks to rescind a contract, the court is not bound by the choice of law articulated in the contract, citing *Ambrosia Coal & Constr. Co. v. Pages Morales*, 368 F.3d 1320, 1334 (11th Cir. 2004) (stating considering the law specified in the agreement presumes the validity of the agreement, which is a core issue). "[R]escission will not be granted for breach of contract, in the absence of fraud, mistake, undue influence, multiplicity of suits, could on title, trust, or some other independent ground for equitable interference." *AVVA-BC, LLC v. Amiel*, 25 So. 3d 7, 11 (Fla. 3rd DCA 2009). Also, "where a party seeking rescission has discovered grounds for rescinding an agreement and either remains silent when he should speak or in any manner recognizes the contract as binding upon him, ratifies or accepts the benefits thereof, he will be held to have waived his right to rescind." *Id*. Mills cited authority indicating that even under Florida law, the breach of a dependent covenant may give rise to an equitable basis for rescission under Florida law. *See Steak House, Inc. v. Barnett*, 65 So. 2d 736, 737 (Fla. 1953) (and noting that a covenant is dependant if it goes to the whole consideration of the contract). However, he makes no argument to overcome his failure to promptly rescind.

*Carman v. Gunn*, 198 So. 2d 76, 84 (Fla. 2d DCA 1967). Viewing the facts in the light most favorable to Mills, the court concludes that outstanding factual issues and credibility determinations related to the parties' course of performance under the contract preclude summary judgment on this counterclaim.

The common law claim of conversion, governed in this case by Florida law, involves "an unauthorized act which deprives another of his property permanently or for an indefinite time;" it "may be demonstrated by a plaintiff's demand and a defendant's refusal," but the demand and refusal are unnecessary where the act complained of amounts to a conversion regardless of whether a demand is made." *Mayo v. Allen*, 973 So. 2d 1257, 1259 (Fla. 1st DCA 2008) (internal marks omitted). However, Florida's economic loss rule prevents a tort action where the parties are in contractual privity and the tort allegation arises from breach of a contractual duty. *See Indemnity Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 536-37 (Fla. 2004). Defendant acknowledges that the economic loss rule may preclude recovery for conversion on its contract claim if the contract is deemed valid, and the court has made that determination. Nonetheless, to the extent this claim is based not on the employment agreement but on rights defendant purchased through the BIG transaction, the claim may go forward, but summary judgment is inappropriate. Mills has raised questions of fact regarding whether he retained equitable rights to the technology at issue by reason of BIG's nonperformance of financial obligations to him. Accordingly, the court denies defendant's motion for summary judgment on the counterclaims.

Accordingly, it is hereby ORDERED:

1. Plaintiff's motion for summary judgment (doc. 53) is **DENIED**.
2. Defendant's motion for summary judgment on plaintiff's claims (doc. 81) is **GRANTED**.
3. Defendant's motion for summary judgment on its counterclaims (doc. 80) is **DENIED**.
4. This matter is hereby specially referred to Magistrate Judge Davis for settlement conference.

5. Trial to be set by separate order.

**DONE AND ORDERED** this 31st day of March, 2011.

s/ *M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**